# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

**Dawn M. Hyland,**                                          Civ. No. 11-1793 (MJD/AJB)

　　　　　Plaintiff,

**REPORT AND RECOMMENDATION**

**v.**

**Michael J. Astrue,**
**Commissioner of Social Security**,

　　　　　Defendant.

_____

Fay E. Fishman, Esq., Peterson and Fishman, P.L.L.P., 3009 Holmes Ave. South, Minneapolis, MN 55408, for Plaintiff.

David W. Fuller, Asst. United States Attorney, 600 United States Courthouse, 300 South 4th Street, Minneapolis, MN 55415, for the Commissioner.

_____

ARTHUR J. BOYLAN, United States Chief Magistrate Judge

　　　The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions for summary judgment.  See 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  This Court has jurisdiction under 42 U.S.C. § 405(g).  Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 10] be granted and Defendant's motion for summary judgment [Docket No. 21] be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Procedural History

Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on October 10, 2008, alleging disability from mental illness beginning September 14, 2007.  (Tr. 180-191, 308.)[1]  Her applications were denied initially and upon reconsideration.  (Tr. 97-101, 104-09.)  Plaintiff timely requested a hearing before an administrative law judge, and the hearing was held on June 23, 2010, before Administrative Law ("ALJ") Richard N. Staples.  (Tr. 110, 17-69.)  Because she had gone back to work, Plaintiff requested that the ALJ award a closed period of disability from October 1, 2007 through June 30, 2009.  (Tr. 21-22.)  The ALJ issued an unfavorable decision on July 30, 2010.  (Tr. 5-16.)  On June 23, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4.)  See 20 C.F.R. §§ 404.981, 416.1481.  On July 6, 2011, Plaintiff sought review from this Court.  The parties thereafter filed cross-motions for summary judgment.

### B.     Factual Background

The Court will briefly summarize Plaintiff's earlier medical records, and prior to the alleged closed period of disability.  The medical records begin in September 2006, when Plaintiff was hospitalized for several days with paranoia and depression, lack of sleep and inability to function.  (Tr. 438-42, 443-52.)  There were several contributing factors to Plaintiff's condition:  stress of her father dying, the pregnancy of one of her daughters, and

---

[1]     The Court will cite the Administrative Record in this matter, Docket No. 7, as "Tr."

the fact that Plaintiff was taking a large dose of diet pills.  (Tr. 438-39.)  On September 19, 2006, Plaintiff began seeing Dr. Colleen Daniewicz at Allina Medical Clinic Woodbury for counseling.  (Tr. 555-56.)  In addition to her current stressors, Plaintiff related that she was sexually abused while in a foster home at age eight.  (Tr. 555.)  Plaintiff had eight siblings but very little support from her family.  (Id.)

Plaintiff was hospitalized again on October 9, 2006 through October 11, 2006, with increasing depression and racing thoughts (Tr. 397-98.)  She was diagnosed with bipolar disorder, mixed.  (Tr. 397.)  Plaintiff improved on the medication Seroquel, and was then admitted to a partial hospital program, which she did not complete.  (Tr. 393-98.)  After this short hospitalization, Plaintiff started counseling with Social Worker Elaine Boyer-Hammond at Aspen Medical Group.  (Tr. 627-28.)  Plaintiff also treated with Licensed Psychologist Diana Beran at Eagan Counseling Center from January through June 2007.  (Tr. 563-84, 642-47.)

Plaintiff began treating with Nurse Deborah Orman and Dr. Scott Yarosh at Psychiatric Recovery, P.A. in February 2007.  (Tr. 724-35.)  Plaintiff also began DBT[2] treatment under the supervision of Dr. Reena Pathak at Psychiatric Recovery, P.A. in July 2007.  (Tr. 913-25.) Her treatment with Dr. Pathak was centered on four areas: depression,

---

[2]     DBT stands for dialectical behavior therapy.  A study published in the Journal of Clinical Psychology in March 2012 suggested DBT was effective in an intensive outpatient program in reducing depression and anxiety and increasing hope.  L.A. Ritschel, J.S. Cheavens, and J. Nelson, "Dialectical behavior therapy in an intensive outpatient program with a mixed-diagnostic sample," *J. Clin. Psychol.* 2012 Mar; 68(3):221-35, available at http://www.ncbi.nlm.nih.gov/pubmed/22422561

anxiety, disorganization and dissociation.[3]  (Id.)

In October 2007, Plaintiff was on short-term disability, she filed bankruptcy, and her home was being foreclosed.  (Tr. 627.)  In addition to these stressors, Plaintiff was processing her childhood abuse and a longstanding abusive relationship with the father of her children.  (Tr. 627-28, 665-66.)  Boyer-Hammond diagnosed Plaintiff with major depressive disorder, severe, with mood congruent psychotic features and PTSD.  (Tr. 625-26.)

Plaintiff underwent a consultative psychological examination with Dr. Alford Karayusuf on January 7, 2008.  (Tr. 659-61.)  At that time, Plaintiff was is in the recovery phase of major depression, with no further hallucinations, delusions or suicidal thoughts; and better mood, better sleep, improving attention and concentration; and hope for the future.  (Id.)  She was living with her three youngest daughters, but also had contact with her oldest daughter and granddaughter.  (Id.)  Dr. Karayusuf opined Plaintiff could understand, retain and follow simple instructions, but was restricted to brief, superficial interactions with fellow workers, supervisors and the public, and she could maintain persistence and pace for simple repetitive tasks.  (Id.)

In January 2008, Plaintiff underwent a neuropsychological examination with Dr. Deborah Roman at University of Minnesota.  (Tr. 663-66.)   Plaintiff reported persistent cognitive and memory problems.  (Tr. 663.)  Plaintiff had a GED, with some community college.  (Id.)  Her employment history included positions as a secretary at a post office,

---

[3]      In psychology and psychiatry, dissociation is a perceived detachment of the mind from the emotional state or even from the body.  It is characterized by a sense of the world as dreamlike or unreal and may be accompanied by poor memory of specific events. http://www.medterms.com/script/main/art.asp?articlekey=38857

assembler at Honeywell, and collections agent at Minnesota Department of Revenue, from which she was currently on leave without pay. (Id.) On mental status examination, Plaintiff's thoughts were articulate, mood was dysthymic, communications were mildly disorganized and tangential; and she needed redirection. (Id.) In hindsight, Plaintiff said she realized diet pills and her many stressors may have contributed to her manic symptoms in 2006. (Id.)

Based on neuropsychological testing, Plaintiff's intelligence was estimated in the average range and most executive abilities were normal. (Tr. 664.) However, Plaintiff's behavior during testing was consistent with hyperactivity and poor impulse control. (Tr. 666.) Plaintiff's history and clinical presentation were consistent with PTSD and borderline personality disorder, which may have caused accelerated thinking and distractibility, abnormal memory, and psychotic symptoms in times of increased stress. (Id.)

Plaintiff began improving in therapy and went back to work part-time in March 2008. (Tr. 755-62.) However, work did not go well because she was overwhelmed and made mistakes. (Tr. 718-19.) Plaintiff was facing termination in June 2008. (Tr. 715-16.) Plaintiff reported to Nurse Orman and Dr. Yarosh that she was sad and anxious, her memory was off, and she had out of body experiences (dissociation) constantly. (Tr. 715.) When Plaintiff saw Dr. Charles Depies at Aspen Medical Group on June 19, 2008, Plaintiff was taking all medications as prescribed and going to therapy, but she was frustrated at her inability to function at the same cognitive level as before her 2006 crisis. (Tr. 747.) Dr. Depies believed Plaintiff's major depression was moderate, with some suicidal risk. (Tr. 748.) Plaintiff reduced her work hours and slowly improved. (Tr. 714, 745-46.) Although Plaintiff felt she was improving, on July 15, 2008, Plaintiff's supervisor wrote to Nurse

Orman about Plaintiff's work performance, requesting an opinion about a one year medical leave of absence. (Tr. 708-10.) Plaintiff was having difficulty remembering the most basic functions of her collection duties that had been an intergral part of her job since 2002. (Tr. 709.) Plaintiff had taken two leave of absences:  January 22, 2007 through Feb. 21, 2007, and September 14, 2007 through February 19, 2008. (Id.) When Plaintiff returned to work in February 2008, she reverted back to not remembering critical details of her job duties. (Id.) All of her work had to be reviewed,  and at least 50% of her work contained errors. (Id.) Prior to her leave in January 2007, Plaintiff was fast, efficient and focused. (Id.) Plaintiff was given much assistance, but there was no improvement in her recall or memory. (Id.) Conversations with Plaintiff were confusing. (Id.) If recommended by her mental health provider, Plaintiff would be placed on one year unpaid medical leave. (Tr. 709-10.)  Nurse Orman opined that Plaintiff's PTSD symptoms prevented her from performing the demands of her job and home life, and she would need three months leave, and then to reevaluate. (Tr. 707.) Plaintiff's leave of absence began on August 18, 2008. (Tr. 713.)

On August 7, 2008, Dr. Depies noted that Plaintiff was emotionally stable most of the last month, and that reducing her employment to twenty hours a week helped, but she was likely to go on medical leave due to her poor work performance. (Tr. 743-44.) Dr. Depies opined that Plaintiff's major depression was currently moderate. (Tr. 743.)

Plaintiff's home was sold through foreclosure in September 2008, and then her financial stress became more manageable. (Tr. 906, 741-42.) On October 13, 2008, Dr. Depies noted that Plaintiff's mood changed quickly when she focused on the past, and she needed to learn to focus on the present and regulate her emotions. (Tr. 739.)  Dr. Depies

diagnosed PTSD and major depression, currently mild.  (Id.)  Plaintiff's medications included Citalopram, Concerta, Valium and Trazadone.  (Id.)  Plaintiff improved her emotional stability and cognitive focus by exercising more and engaging in energizing activities.  (Tr. 837-38, 840-43, 845-46.)  Plaintiff continued to have anxiety, but was slowly healing and planned to take a reading class starting in January 2009.  (Tr. 862.)  Nurse Orman and Dr. Yarosh diagnosed Plaintiff with PTSD and borderline traits.  (Id.)

Plaintiff underwent a consultative examination with Dr. Dustin Warner on December 16, 2008, at the request of the Social Security Administration.  (Tr. 812-15.)  Plaintiff said she was probably depressed for ten years before she crashed in 2006.  (Tr. 812.)  Plaintiff lived with her three daughters, and she could do housework and grocery shop.  (Tr. 813.)  She spent four hours a week in DBT therapy.  (Id.)  She was also going to some meetings about taking college courses.  (Id.)   She did not have any hobbies, and otherwise spent her time with her children.  (Id.)

On mental status examination, Plaintiff was alert and oriented.  (Tr. 813.)  Her speech was clear and goal directed.  (Tr. 814.)  She was cooperative, and thought processes were intact.  (Id.)  Her thought content was normal and stream of consciousness was reality based.  (Id.)  Her affect was blunted, with some signs of anxiety.  (Id.)  Her insight, judgment, and recent and remote memory were intact.  (Id.)  She reported symptoms of nightmares or flashbacks from trauma, easy startle response, avoiding things that reminded her of traumatic events, depressed mood, anhedonic, low energy, sleep disruption, trouble concentrating, and feeling helpless and hopeless.  (Id.)

Dr. Warner diagnosed major depressive disorder and PTSD.  (Tr. 815.)  He opined that Plaintiff had the mental capacity to understand, remember and follow simple

instructions, sustain attention and concentration to carry out tasks with reasonable persistence and pace, and respond appropriately to brief and superficial contact with coworkers and supervisors.  (Id.)  Dr. Warner also believed that Plaintiff would not tolerate the stress and pressure found in most entry level workplaces, due to depression and anxiety.  (Id.)

Near the end of December 2008, Nurse Orman and Dr. Yarosh noted Plaintiff's mood was good; and she was functioning better with less PTSD symptoms.  (Tr. 861.) About a week later, when Dr. Depies saw Plaintiff, she was emotionally stable and getting rest and exercise to help focus on her recovery.  (Tr. 834-35.)  Plaintiff's emotional and cognitive improvement continued through March 2009.  (Tr. 860, 876, 889-92.)  Plaintiff was thinking about going back to work when her classes were finished.  (Tr. 876, 887.) Plaintiff was taking better care of herself and getting in-home family therapy.  (Tr. 883-84.) She still had good days and bad days.  (Tr. 875.)  In May 2009, Plaintiff was emotionally stable, and Dr. Depies diagnosed PTSD and major depression in partial remission.  (Tr. 881-82.)

Dr. Pathak completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" form regarding Plaintiff, indicating the opinions expressed in the form were applicable from July 2007 through May 2009.  (Tr. 871-73.)  Dr. Pathak checked a box on the form to indicate that Plaintiff had poor or no ability to maintain attention and concentration.  (Tr. 871.)  He checked boxes indicating that the following of Plaintiff's abilities were between fair and poor or none:  deal with work stress; understand, remember and carry out complex job instructions; and understand, remember and carry out detailed but not complex job instructions.  (Tr. 871-72.)  Dr. Pathak opined Plaintiff would have

between good and fair abilities to do the following:  understand, remember and carry out simple job instructions; behave in an emotionally stable manner; relate predictably in social situations; demonstrate reliability; relate to coworkers; and deal with the public.  (Id.) Plaintiff would have a good ability to use judgment and maintain personal appearance, and a very good ability to follow work rules.  (Id.) Dr. Pathak wrote: "[the] areas impacted would be tasks requiring complex steps and prolonged concentration.  Client may lose focus and lack attention to detail under stress.  This has improved somewhat in last 3-4 months."  Dr. Pathak opined Plaintiff would miss work three times a month due to her impairments.  (Tr. 873.)

Plaintiff returned to work on June 1, 2009, starting at fifteen hours per week.  (Tr. 874.)  She was nervous with increased anxiety, but generally stable.  (Id.)  By July 1, 2009, Plaintiff was working seven to eight hours a day and functioning well.  (Tr. 911.)  In therapy, she continued working to avoid old patterns that led to burn out, stress and depression. (Id.)

C.    **The Administrative Hearing**

At the hearing before the ALJ, Plaintiff requested a closed period of disability from October 1, 2007 through June 30, 2009.  (Tr. 21-22.)   Plaintiff worked in tax collections for the State of Minnesota, but she had been demoted two grades since returning to work.  (Tr. 31-33.)  Plaintiff lived with her three younger children, and she also had an adult daughter and grandchild.  (Tr. 33.)  Plaintiff's mental illness began in 2006 when her father was dying, her oldest daughter was pregnant, and Plaintiff was working three or four jobs to support her family.  (Tr. 36.)  She had worked three or four jobs for ten years.  (Tr. 37.)  Her mental illness started with being unable to sleep for long periods; she was anxious and had

9

hallucinations.  (Tr. 37-38.)  She kept trying to work because she needed the money, but she took a one year leave of absence when her employer promised her job back after the leave.  (Tr. 38.)  She had been unable to do her job because she was overwhelmed with anxiety and could not focus.  (Tr. 38-39.)  Even with her two level demotion, she was struggling to do her job.  (Tr. 39.)  Plaintiff felt she might do better with one more level demotion.  (Tr. 39-40.)

When Plaintiff was on medical leave from work and caring for her home and children, it was manageable.  (Tr. 41.)  She took her kids to school, went to group and individual therapy a total of four times a week, and studied genealogy at the library.  (Tr. 42.)  Previously, when she tried to go back to work in 2008, Plaintiff was anxious, not sleeping, and having flashbacks.  (Tr. 41-42.)  This led to her inability to concentrate and making errors.  (Tr. 43.)  She met with her supervisor every two weeks, and her supervisor was concerned over her poor memory and confusion.  (Tr. 44.)  Plaintiff also had a problem with dissociation, something she did her whole life.  (Tr. 46.)  Her energy level was very poor when she tried to work in 2008.  (Tr. 46-47.)

Plaintiff tried to take some classes starting in January 2009.  (Tr. 67.)  She took a reading class, because she felt she had to relearn skills.  (Id.)  She did not finish the course because she could not always retain what she read.  (Tr. 68.)  This was a not a lifelong problem, only the last few years.  (Id.)

Dr. Karen Butler, a clinical psychologist, then testified as a medical expert.  (Tr. 48.)  Dr. Butler testified that for the period from October 2007 through June 2009, Plaintiff had the RFC for simple, unskilled work with moderate standards for pace and production.  (Tr. 51.)  Plaintiff would also be limited to brief and superficial contact with others.  (Id.)  Dr.

Butler explained that through most of 2008, Plaintiff's depression was described as moderate to mild, and she tested well.  (Tr. 52.)

The next witness was David Russell, who testified as a vocational expert.  (Tr. 57-58.)  The ALJ asked Russell a hypothetical vocational question assuming a person with the same age, education and work history as Plaintiff, who would be limited to unskilled work involving simple, repetitive tasks, with low stress, defined as no fast paced activity or high production quotas.  (Tr. 62.)  The individual would also be limited to brief and superficial contact with the public, coworkers and supervisors.  (Id.)  The VE testified that such a person could perform Plaintiff's past work in assembly and kitchen work.  (Tr. 63.)

For a second hypothetical question, the ALJ told the VE to assume the same person as in the first hypothetical question, but with the additional limitation that the person would be off task 20% of the time due to psychiatric symptoms.  (Id.)  The VE testified that such a person could not perform any of Plaintiff's past relevant work or any other job on a competitive basis.  (Id.)  Plaintiff's counsel asked the VE a third hypothetical question, assuming the person has the following limitations: understand, remember and follow simple instructions; sustain attention and concentration to carry out work-like tasks with persistence and pace; respond appropriately to brief and superficial contact with coworkers and supervisors; but unable to tolerate stress and pressure found in entry level work.  (Tr. 64.)  The VE testified such a person could not perform any of Plaintiff's past relevant work or any other work.  (Id.)

Plaintiff's counsel asked a fourth hypothetical question which assumed the person would have a fair to poor ability to deal with work stress or maintain attention and concentration.  (Tr. 64-65.)  The VE responded "a gray area [inaudible] generally not

11

precluding employment [inaudible] probably would." (Tr. 65.) Plaintiff's counsel also asked the VE to consider a person who had no useful ability to maintain attention and concentration, but the VE's response was inaudible. (Id.) The VE's response to counsel's question about the acceptable rate of absenteeism was also inaudible. (Id.) Then, the VE testified that if a person was making mistakes in 50% of their job, the person would not be employable. (Tr. 66.) If an employer kept an employee under such conditions, the VE would consider it to be sheltered employment. (Id.)

### D.    The ALJ's Decision

On July 30, 2010, the ALJ issued his decision denying Plaintiff's applications for disability insurance benefits and supplemental security income. (Tr. 5-16.) The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. See 20 C.F.R. §§ 404.1520, 416.920. The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work;" and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that the claimant had

not engaged in substantial gainful activity during the alleged closed period of disability.  (Tr. 10.)  At the second step of the process, the ALJ found that Plaintiff had severe impairments of major depressive disorder and post traumatic stress disorder.  (Tr. 11.)  At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 11-12.)

At the fourth step of the evaluation process, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of exertional work with the following non-exertional limitations: unskilled work involving only simple, repetitive tasks; low stress work, defined as work that does not involve fast-paced activity or high production quotas; and brief and superficial interaction with coworkers, supervisors and the public.  (Tr. 12-14.)  The ALJ gave the following reasons for his conclusion.  Plaintiff continued doing skilled work throughout most of the closed period of disability.  (Tr. 13.)  Dr. Butler testified that although Plaintiff probably could not perform skilled work during the closed period without accommodation from her employer, she could perform simple, unskilled work; and Dr. Butler's opinion was consistent with Dr. Karayusuf's and Dr. Warner's opinions.  (Tr. 13-14.)

The ALJ also found Plaintiff's activities of daily living during the closed period inconsistent with total disability because she cared for her three children, maintained a household, took a college class, and attended therapy.  (Tr. 14.)  And, Plaintiff was not hospitalized during the closed period.  (Id.)   The ALJ rejected Dr. Pathak's opinion of disability and Dr. Warner's opinion that Plaintiff could not tolerate work stress, because it was inconsistent with other opinion evidence and with Plaintiff's daily activities, and her

13

improvement in a less stressful situation.  (Tr. 14.)

At the fourth step of the evaluation process, based on the VE's testimony, the ALJ concluded the claimant was capable of performing past relevant work as an assembler and kitchen helper.  (Tr. 14-15.)  The ALJ concluded that Plaintiff was not under a disability, as defined in the Social Security Act, from October 1, 2007 through June 30, 2009.  (Tr. 16.)

## II.   DISCUSSION

### A.   Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Davidson v. Astrue, 578 F.3d 838, 841 (8th Cir. 2009).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Brace v. Astrue, 578 F.3d 882, 884 (8th Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation omitted)).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  Id.

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (if supported by substantial evidence, the ALJ's

14

determination must be affirmed, even if substantial evidence would support the opposite

finding.)  Instead, the Court must consider "the weight of the evidence in the record and

apply a balancing test to evidence which is contradictory."  Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits.

See 20 C.F.R. §§ 404.1512(a);416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir.

1991).  Once the claimant has demonstrated he or she can not perform past work due to

a disability, the burden of proof shifts to the Commissioner to show that the claimant can

engage in some other substantial gainful activity.  Moore v. Astrue, 572 F.3d 520, 523 (8th

Cir. 2009).

### B.   Analysis

### 1.   Medical Opinions

Plaintiff raised three arguments in support of her motion for summary judgment.

First, she argues the ALJ failed to properly weigh the medical opinions, and that the record

supports granting more weight to the opinions of her treating psychologist, Dr. Pathak, and

the second consultative examiner, Dr. Warner.  Second, Plaintiff asserts the ALJ erred in

evaluating her subjective complaints by failing to consider all of the facts related to her daily

activities, ignoring the witness testimony, discounting her credibility because she was not

hospitalized, and not crediting her strong work record.  Third, Plaintiff contends the ALJ

relied on the testimony of the VE in response to a faulty hypothetical question that did not

contain all of Plaintiff's limitations from her impairments.

The regulations require the ALJ to consider every medical opinion in the record.  20

C.F.R. § 404.1527(d).  Generally, more weight is given to a treating physician's opinion,

because "these sources are likely to be the medical professionals most able to provide a detailed longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations…." Id. at 404.1527(d)(2). If the ALJ finds the treating source's opinion on the issues of the nature and severity of the claimant's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, then it will be accorded controlling weight. Id.

If the ALJ determines that the treating doctor's opinion does not warrant controlling weight, then the ALJ must consider other factors, including "any factors… which tend to support or contradict the opinion." Id. "While the opinion of a treating physician is entitled to substantial weight, it is not conclusive because the record must be evaluated as a whole. Moreover, a treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion." Howe v. Astrue, 499 F.3d 835, 839 (8th Cir. 2007) (citation and quotation omitted). Even if the treating physician's opinion is not given controlling weight, it "should not ordinarily be disregarded." See Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000.)

The ALJ discounted Dr. Pathak's and Dr. Warner's opinions that Plaintiff could not tolerate work stress during the relevant time period, but the ALJ did not discuss Dr. Pathak's opinion that Plaintiff would have a poor ability to maintain attention and concentration. Instead, the ALJ granted more weight to the opinions of the medical expert and the first consultative examiner, because the ALJ found these opinions more consistent with Plaintiff's daily activities and the fact that Plaintiff's symptoms improved significantly

16

when she was in a less demanding and stressful position.

The Court finds Dr. Pathak's RFC opinion is consistent with Dr. Warner's opinion and supported by the conclusions from Plaintiff's neuropsychological examination, specifically her history and clinical presentation, that her PTSD and borderline personality could cause accelerated thinking, abnormal memory, and psychotic symptoms in times of stress. This is in fact what happened after Plaintiff returned to part-time work in March 2008. Plaintiff's employer wrote a letter stating Plaintiff was making many mistakes. Plaintiff's memory of the requirements for her job did not improve, even though she was given much assistance; and she could not perform the basic functions of her job, even on a part-time basis. Before Plaintiff's "breakdown" in 2006, Plaintiff's employer said Plaintiff was fast, efficient and focused at work. Nurse Orman, who treated Plaintiff regularly starting in February 2007, opined that PTSD prevented Plaintiff from working in July 2008, and she would need a leave of absence. Plaintiff took a ten month leave of absence beginning in August 2008. It is reasonable to conclude Plaintiff's symptoms would also have precluded any substantial gainful activity at that time.

It is true that Plaintiff improved with treatment and was able to care for her home and children while on her leave of absence. However, the additional stress of substantial gainful work before she had sufficiently treated her PTSD may have resulted in decompensation, as it did when she tried to return to work too soon after her leave of absences in 2007. For instance, in October 2008, Dr. Depies noted Plaintiff's mood changed quickly when she focused on the past, and she needed to learn to focus on the present. In December 2008, Nurse Orman noted Plaintiff was not depressed but still felt anxiety, and was slowly healing.

17

The RFC opinions of Dr. Pathak and Dr. Warner are supported by the objective findings of the neuropsychological examination and the record as a whole.  Therefore, the ALJ should have granted Dr. Pathak's treating opinion controlling weight.  Even if Dr. Pathak's opinion was not granted controlling weight, the length of the treatment relationship, frequency of examination; nature and extent of the treatment relationship; supportability of Dr. Pathak's opinion, and Dr. Pathak's specialization weigh in favor of granting more weight to Dr. Pathak's opinion than the opinions of a nonexamining medical expert, and Dr. Karayusuf, a consultative examiner who only examined Plaintiff once, before the end of the relevant time period.  Dr. Pathak treated Plaintiff with DBT therapy for four primary symptoms:  depression, anxiety, disorganization and dissociation, from February 2007 through at least June 2009.  In December 2008, Plaintiff reported to Dr. Warner that she had DBT therapy four hours a week.

Dr. Pathak stated that Plaintiff may lose focus and lack attention to detail under stress, which is consistent with the record as a whole.  After her severe stress reaction in late 2006 and other severe stressors in 2007, Plaintiff unsuccessfully tried to go back to work several times before taking a longer leave of absence.  It was only with this ten month leave of absence that she was able to decrease her stress and improve with treatment, leading to return to a lesser skilled level of work.  Dr. Pathak believes Plaintiff would have been unable to return to any substantial gainful employment before June 2009, and his opinion deserves great weight.

### 2.      Credibility Analysis

Plaintiff's second argument is that the ALJ erred in evaluating her subjective complaints.  The Court "defer[s] to the ALJ's determinations regarding the credibility of

testimony, so long as they are supported by good reasons and substantial evidence."
Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).   In assessing a claimant's
credibility, the ALJ must consider (1) the claimant's daily activities; (2) the duration,
intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the
dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the
claimant's work history; (7) and the absence of objective medical evidence to support the
claimant's complaints.   Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v.
Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).   The ALJ need not explicitly discuss each
factor.   Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).   "It is sufficient if he
acknowledges and considers [the] factors before discounting a claimant's subjective
complaints."  Id. (quotation omitted).

The ALJ's credibility analysis focused on two factors, Plaintiff's daily activities and
Plaintiff's treatment.   The ALJ discounted Plaintiff's credibility because she was not
hospitalized during the relevant time frame, and received only conservative mental health
treatment.   This was in error because Plaintiff received extensive mental health treatment
on an outpatient basis from multiple providers, Nurse Orman and Dr. Yarosh, Dr. Pathak,
and Dr. DePies, during the relevant time period.   In October 2008, Plaintiff's medications
were Citalopram, Concerta, Valium and Trazadone.   Concerta is prescribed for attention
deficit hyperactivity disorder.[4]   Valium is prescribed for anxiety disorders, and is not
prescribed simply for anxiety or tension associated with the stress or tension of everyday

---

[4]      *Physician's Desk Reference* ("*PDR*") 1927-28 (59th ed. 2005).

life.[3]  Plaintiff improved from therapy and medications, but that is why Plaintiff returned to work and asked only for a closed period of disability.

Other factors also bolster Plaintiff's credibility.  As discussed above, the findings from Plaintiff's neuropsychological examination support her subjective complaint of being unable to perform substantial gainful activity during the relevant time period due to increased PTSD symptoms under stress.  Plaintiff's strong work history and attempts to return to work as soon as possible are additional factors supporting Plaintiff's credibility.

The ALJ's primary reason for rejecting the credibility of Plaintiff's subjective complaints was that he found Plaintiff's daily activities inconsistent with disability.  However, the ALJ did not recognize the fact that Plaintiff was able to function in caring for her children and household because she was not working and was receiving frequent mental health treatment.  In a Function Report dated January 19, 2009, Plaintiff explained that she was able to care for her home and children because she forced herself to function while she was overcoming the stress from traumatic events that she suffered from for many years. (Tr. 351-58.)  She spent much time in therapy, and was taking a reading class to improve her attention and concentration, and taking a budgeting class to improve her financial situation.  (Id.)  In a Third Party Function Report dated January 21, 2009, Plaintiff's adult daughter reported that Plaintiff was able to care for her three younger daughters and attend daily therapy sessions and a class at a community college.  (Tr. 359-60, 363.)  Plaintiff still had difficulty with memory and concentration, and relied on a daily planner.  (Tr. 364.) Plaintiff did not handle stress or changes in routine well, stress caused her to become

_____

[5]        PDR 2957.

anxious and frustrated.  (Tr. 365.)  This testimony was consistent with the record as a whole.  For these reasons, the ALJ's crediblity analysis is not supported by substantial evidence in the record.

### 3. Vocational Expert Testimony

Plaintiff asserts the ALJ's hypothetical question to the vocational expert did not contain all of the concrete consequences of Plaintiff's impairments on her ability to work.  "Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies."  Collins v. Astrue, 648 F.3d 869, 872 (8th Cir. 2011) (quoting Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007)).  The Court agrees that the hypothetical question was faulty because the ALJ did not credit Dr. Pathak's opinion that Plaintiff could not tolerate work stress during the closed period of October 2007 through May 2009.  For this reason, the ALJ's decision should be reversed, and the case remanded for award of benefits for the closed period of October 2007 through May 2009.  See Pate-Fires v. Astrue, 564 F.3d 935, 947 (8th Cir. 2009) (reversing for award of benefits where clear weight of evidence supported disability determination).

### III. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1. Plaintiff's Motion for Summary Judgment [Docket No. 10] be **GRANTED**;

2. Defendant's Motion for Summary Judgment [Docket No. 21] be **DENIED;**

3.    If this Report and Recommendation is adopted, that judgment be entered accordingly.


Dated: April 2, 2012                              s/ Arthur J. Boylan
                                                  ARTHUR J. BOYLAN
                                                  United States Chief Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before April 16, 2012.